**No. 25-60424**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee**

**VERSUS**

**CLEVELAND ANDERSON, ET AL.**

**Defendants-Appellants**

---

**On Appeal from**
United States District Court for the Southern District of Mississippi
Northern Division
Honorable Kristi H. Johnson, United States District Judge
USDC No. 3:21-CR-130-2
USDC No. 3:21-CR-130-1

---

# INITIAL BRIEF OF APPELLANT RUDOLPH WARNOCK
# CRIMINAL APPEAL

---

By: */s/ Keith B. French*
Keith B. French
Bar No. 24115073
401 E. Capitol St., Suite 515
Jackson, MS 39201
kfrench@peoplefirstfirm.com
Tel: 832-243-6153
Fax: 877-314-1857
Attorney for Appellant/Defendant

## CERTIFICATE OF INTERESTED PERSONS

I certify that the following individuals may have an interest in the outcome of this case. I make these representations in order that the members of this Court may evaluate possible disqualifications or recusal.

| | |
|---|---|
| District Judge: | Honorable Kristi H. Johnson |
| Appellant: | Rudolph Warnock |
| Defense Counsel (Trial): | John M. Colette<br>Jeffrey Matthew Graves<br>Thomas J. Spina |
| Appellant Counsel: | Keith B. French |
| U.S. Department of Justice | Jordan Dickson |
| Assistant U.S. Attorney for<br>The Southern District of Mississippi: | Jennifer Case<br>Kimberley Taft Purdie |

*/s/ Keith B. French*
Keith B. French

## STATEMENT REGARDING ORAL ARGUMENT

Appellant does not request oral argument. This appeal presents issues of guideline application and record-based error that are fully addressed in the briefs and the record. Oral argument would not significantly aid the decisional process.

# TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| Statement of Jurisdiction……………………… | | 1 |
| Statement of Issues Presented for Review……….. | | 2 |
| Statement of the Case…………………………. | | 3 |
| I. | Nature of the Case………………….. | 3 |
| II. | Statement of Facts………………….. | 4 |
| Summary of the Argument……………………….. | | 11 |
| Argument …………………………………… | | 13 |
| I. | The District Court Erred in Denying Appellant's Rule 29 Motion for Acquittal Based on Insufficient Evidence. ……………….. | 13 |
| II. | Errors in the Trial Court's Jury Instructions Require Reversal of Warnock's Convictions.………………. | 18 |
| III. | Admission of Jerome Miles's hospital deposition was an abuse of discretion under Rule 15 and violated Appellant's rights under the Confrontation Clause…………………… | 20 |
| IV. | Whether the district court erred in calculating the advisory Guidelines range under U.S.S.G. § 2C1.1(b)(2) by relying on gross invoice amounts rather than net value, and committed procedural error by adopting the PSR methodology and effectively shifting the burden to the defendant.………………………………………………… | 28 |
| Certificate of Compliance……………………………. | | 37 |

# TABLE OF AUTHORITIES

## Cases

*Barber v. Page*, 390 U.S. 719, 724–25 (1968) ........ 24
*California v. Green*, 399 U.S. 149, 165–66 (1970) ........ 25
*Crawford v. Washington,* 541 U.S. 36, 59 (2004) ........ 24
*Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) ........ 21, 25
*Mancusi v. Stubbs*, 408 U.S. 204, 213–16 (1972) ........ 25
*Ocasio v. United States*, 578 U.S. 282, 288 (2016) ........ 17
*Skilling v. United States*, 561 U.S. 40 (2010) ........ 16
*Snyder v. United States*, 603 U.S. 327 (2024) ........ passim
*United States v. Hope*, 487 F.3d 224 (5th Cir. 2007) ........ 13
*United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005) ........ 13
*United States v. Tomblin*, 46 F.3d 1369, 1381 (5th Cir. 1995) ........ 14
*United States v. Acosta*, 475 F.3d 677, 680 (5th Cir. 2007) ........ 20
*United States v. Dearden*, 546 F.2d 622, 624 (5th Cir. 1977) ........ 20, 21, 22, 23
*United States v. Dillman*, 15 F.3d 384, 389 (5th Cir. 1994) ........ 20
*United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) ........ 14, 15, 16, 17
*United States v. Garcia-Gonzalez*, 714 F.3d 306, 313 (5th Cir. 2013) ........ 13
*United States v. Hamilton*, 46 F.4th 389, 399 (5th Cir. 2022) ........ 16, 18, 20
*United States v. Harris*, 821 F.3d 589, 601 (5th Cir. 2016) ........ 28
*United States v. Jimenez*, 464 F.3d 555, 562 (5th Cir. 2006) ........ 21
*United States v. Johnson*, 439 F.2d 885, 888 (5th Cir.) ........ 15
*United States v. Lucas*, 516 F.3d 316, 348 (5th Cir. 2008) ........ 21
*United States v. Nagin*, 810 F.3d 348, 351 (5th Cir. 2016) ........ 16
*United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996) ........ 14
*United States v. Porter*, 542 F.3d 1088, 1092 (5th Cir. 2008) ........ 15
*United States v. Shah*, 84 F.4th 190 (5th Cir. 2023) ........ 15
*United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014) ........ 15
*United States v. Stanford*, 823 F.3d 814, 828 (5th Cir. 2016) ........ 18
*United States v. Sublett*, 124 F.3d 693, 694-95 (5th Cir. 1997) ........ 29
*United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978) ........ 15

## Statutes

1346 ........ 14

18 U.S.C. § 1349 .......... 14
18 U.S.C. § 3231 .......... 1
18 U.S.C. § 371 .......... 14
18 U.S.C. § 3742 .......... 1
18 U.S.C. § 666 .......... 14, 19, 20
18 U.S.C. §§ 1343 .......... 14
18 U.S.C. § 1952 .......... 14
28 U.S.C. § 1291 .......... 1

**Other Authorities**

2B1.1(b)(1).......... 30
USSG §§ 2C1.1(b)(2) .......... 30, 31

**Rules**

FED. R. APP. P. 4 .......... 1
Fed. R. Crim. P. 29(a).......... 13
Fed. R. Crim. P. 15 .......... 21, 23

## STATEMENT OF JURISDICTION

1. Subject Matter Jurisdiction in the District Court. This case arose from the prosecution of offenses against the laws of the United States of America. The district court had jurisdiction of this case under 18 U.S.C. § 3231.

2. Jurisdiction in the Court of Appeals. This is a direct appeal from a final decision of the United States District Court for the Southern District of Mississippi, Northern Division, entering judgment of conviction and imposing a criminal sentence. This Court has jurisdiction of the appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

The district court announced its sentence and entered final judgment against Appellant on December 10, 2025. ROA.26. Appellant filed his notice of appeal the following day, December 11, 2025, in accordance with FED. R. APP. P. 4. *Id.*

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I. **Whether the District Court erred in denying Warnock's Rule 29 motion for acquittal based on insufficient evidence.**

II. **Whether Warnock is entitled to a new trial due to errors in the jury instructions.**

III. **Whether permitting the government to present Jerome Miles's prerecorded hospital deposition under Federal Rule of Criminal Procedure 15 was an abuse of discretion and/or violation of the Confrontation Clause.**

IV. **Whether the district court erred in calculating the advisory Guidelines range under U.S.S.G. § 2C1.1(b)(2) by relying on gross invoice amounts rather than net value, and committed procedural error by adopting the PSR methodology and effectively shifting the burden to the defendant.**

# STATEMENT OF THE CASE

## I. Nature of the Case

This is an appeal from the conviction of Rudolph Warnock on four felony counts related to an alleged bribery scheme between Warnock, a private business owner, and former Canton Municipal Utilities ("CMU") board members Andrew Grant ("Grant") and Eric Gilkey ("Gilkey") and City of Canton alderman Cleveland Anderson ("Anderson"). ROA.22-26, 431-39.

On December 8, 2021, a federal grand jury in the Southern District of Mississippi returned a four-count indictment against Warnock and these alleged co-conspirators on charges of: (1) conspiracy to commit federal program bribery (Count 1), 18 U.S.C. §§ 371, 666; (2) conspiracy to violate the Travel Act (Count 2), 18 U.S.C. §§ 371, 1952; (3) conspiracy to commit honest-services wire fraud (Count 3), 18 U.S.C. §§ 1343, 1346, 1349; and (4) honest services wire fraud (Count 4), 18 U.S.C. §§ 1343, 1346. ROA.431-39. Specifically, the Indictment alleged that Warnock bribed Grant, Gilkey and Anderson with monetary payments and gifts "for the purpose of influencing and rewarding them for favorable treatment" in awarding engineering services contracts to Warnock on behalf of the City of Canton and Canton Municipal Utility agency ("CMU") throughout 2016 and 2017. *Id.* The Indictment further alleged that this scheme defrauded the City of Canton and its citizens of their intangible right to honest services. *Id.*

On July 16, 2025, following a joint jury trial with co-defendant Anderson, Warnock was found guilty of all charges. ROA.22, 571-72. On December 10, 2025, the Court sentenced Warnock to a total term of 144 months imprisonment followed by a 3-year term of supervised release and a $100,000 fine. ROA.25-26, 1690-91. Warnock filed his notice of appeal the following day.

## II. Statement of Facts

### A. Relevant Parties

#### ***1. Rudolph Warnock***

Appellant Rudolph Warnock is a private businessman and professional engineer born and raised in Mississippi. Sealed PSR, Dkt. 240 at 57-68, ROA.910-11, 1067:3-19, 1141, 1169-70, 1262-63, 1355. Warnock earned his bachelor's degree in civil engineering from Mississippi State University and, in 2001, obtained his engineering license from the State of Mississippi, which he maintained at all relevant times to this appeal. Sealed PSR, Dkt. 240 at 67-68. In April 2002, Warnock opened his own private engineering company, Warnock Engineering, LLC, which successfully operated throughout the state of Mississippi for over a decade prior to the alleged misconduct set forth in the indictment. *Id*.

Throughout that time, Warnock was routinely hired to provide engineering services for local government agencies, including but not limited to: the City of Canton, City of Madison, Madison County, Leake County, City of Flowood, City of Brandon, Pearl River Valley, City of Pearl and City of Richland. *Id*., ROA.1067:3-19,

1262:16-1263:15. Indeed, Warnock was specifically selected to serve in the following roles:

- Assistant Madison County Engineer (2000-2002);
- Madison County Engineer (2002-2016);
- Flowood City Engineer (2003-2008);
- Canton City Engineer (2006-2017); and
- Leake County Engineer (2010-2018).

*Id*.

Warnock was known to be a "good engineer" and was well respected for his quality of services. *Id*. Warnock also had a reputation of being a "wealthy man" who was very generous by nature. ROA.960:1-5, 1165:1-19, 1170:2-5, 1273:14-18. Government witnesses described a long history of Warnock donating his time and money to helping people in need, whether friends, colleagues or strangers. ROA.993:20-994:6, 1008:24-1009:19, 1243:13-1244:15, 1269:7-1270:9, 1273:14-1274:9, 1165:1-18. Indeed, it was custom of Warnock to give to others without expecting anything in return. *Id*. He often treated his friends, colleagues and guests to dinners, trips and other events, regardless of whether they were involved in politics or their position in society. *Id*. Warnock hosted crawfish boils and cookouts at his lake house that were considered to be "open to the public." *Id*. In short, Grant, Gilkey and Anderson were far from the only ones receiving the "stream of benefits" from Warnock

that the government now seeks to characterize as bribes. *Id.*, ROA.824-25. Warnock was simply a man who enjoyed sharing his wealth with those around him.

### *2. Canton Municipal Utilities (CMU) and the Canton Board of Alderman*

Canton Municipal Utilities ("CMU") is a municipally owned utility company that services the city of Canton and other areas of Madison County, in part, by providing water, sewer, wastewater and gas to its citizens. ROA.850:12-17, 912:16-18. CMU is governed by a Board of Commissioners whose members are appointed by the City of Canton Board of Aldermen. ROA.850:18-19, 912:19-24, 1142:12-14, 1199:23-1200:11. The City of Canton Aldermen are elected officials who serve four-year terms. ROA.905:14-906:1 The CMU Board of Commissioners has the authority to hire and fire CMU personnel and enter into contracts for services with private companies and/or individuals on CMU's behalf, typically through a vote of its members. ROA.918:13-919:18, 1199:23-1200:11. The Canton Board of Alderman has similar authority with respect to such contracts entered into on behalf of the city. ROA.918:13-919:18, 1139:3-14.

Starting in the early 2000s and continuing into 2017, the Canton Board of Aldermen, along with other local government agencies, routinely authorized engineering contracts between the city of Canton and Warnock, with Warnock serving as the Canton City Engineer from 2006 to 2017. Sealed PSR, Dkt. 240 at 57-68; ROA.910:17-911:19, 920:9-19, 1067:3-19, 1141:17-23, 1169:17-1170:15, 1222:8-

1223:4; 1226:15-1227:8, 1262:16-1263:15. On January 4, 2016, while Warnock was serving as both the Canton city engineer and Madison County engineer, CMU entered into an agreement for General Engineering Services with Warnock Engineering, LLC. ROA.1007:2-9, 1980-95. Later on that year, the CMU board voted to hire Warnock to replace Waggoner Engineering as the CMU engineer, which the government identifies as an official action that Warnock sought to influence in exchange for the alleged stream of benefits he provided. On September 21, 2016, after the entire board, including those who did not receive any benefits, hired Warnock as the CMU engineer, CMU entered into another general services agreement with Warnock, on essentially the same terms and same rates as was in the January 2016 Agreement. ROA.1870-84.

At around that same time, the City of Canton was facing severe problems related to its sewage system that was causing sewage to back up into residents' homes, particularly in certain poorer areas of town. ROA.864-866, 927-928, 1005, 1021-22. 1244-45. Grant and Gilkey both testified that these sewer issues constituted a real emergency that needed to be addressed in a hurry. ROA.1005, 1168-69. For that reason, CMU entered into another agreement with Warnock on October 7, 2016, specifically to provide engineering services to fix the water and sewer issues facing the city. ROA.1858-68. Given the severity of the issues and with the authority of the CMU board, Warnock immediately began working to rectify these issues and submitted

invoices to CMU detailing his work in accordance with the terms of the agreements. ROA.1787-1854.

***3. Andrew Grant***

Grant served as an alderman for the City of Canton from 2013 to 2017 and was charged as a co-conspirator in this case. ROA.431-39. Grant entered into a plea agreement with the government and agreed to cooperate with the prosecution and testify against Warnock. ROA.908:11-910:7, 1747-54.

Grant first met Warnock in 2008 while he was working as a sign laborer for the Madison County road department and Warnock was serving as the Madison County engineer. ROA.910-912, 992-94. Grant was impressed with Warnock's engineering work and they soon became close friends. *Id*. Grant often visited Warnock at his house and spent time with his family prior to any of the alleged misconduct in this case. *Id*. When Grant's house burned down, Warnock led the charge the help Grant by providing him with, among other things, clothes, beds and stuff for his children. *Id*.

When Grant first became involved in politics in 2013 and ran for the City of Canton Board of Alderman, he sought campaign contributions from numerous sources, including Warnock, several attorneys and at least one other engineering firm. ROA.903:9-904:6. *Id*. Grant won the election and started his four-year term as alderman in July of 2013. ROA.905-6. Later that year, Grant lobbied support to hire Warnock as the City of Canton Engineer. ROA.910-912, 992-94. Because Warnock

was already serving as the Madison County engineer at the time, Grant thought it would be a "great idea" to hire Warnock because "in a lot of cases the city and county… have to work together on different projects" and Grant was familiar with and impressed with Warnock's work. *Id.* Grant and Warnock remained friends after Warnock was hired and Warnock treated Grant with the same generosity he treated any other customer and friend. ROA.1271:15-17.

***4. Eric Gilkey***

Gilkey was an alderman for the City of Canton from approximately 2001 to 2021 and was charged as a co-conspirator in this case. ROA.1138:14-1139:14. Gilkey entered into a plea agreement with the government and agreed to cooperate with the prosecution and testify against Warnock. ROA.1135:10-1137:4, 1164:20-25, 1175-81.

Gilkey and Warnock "were friends long before [Warnock] became affiliated with [CMU]" in 2016. ROA.1165-66. Like with Grant, for years prior to Warnock becoming the CMU engineer, Warnock treated Gilkey with the same generosity he treated all his friends. *Id.* For instance, it was not uncommon for Warnock to pick up the tab when they went out to dinner together, something that Warnock would regularly do for people not in politics as well. *Id.* Warnock also contributed to Gilkey's campaign for public office when he ran – something that is not unusual in the world of politics and, like with Warnock's contribution, did not always come with the expectation of getting something in return. *Id.*

### *5. Cleveland Anderson*

Anderson was appointed to the CMU commission by the Board of Alderman on June 7, 2016, after Warnock was already doing engineering work for CMU. ROA.3024:24-15, 3042-3043. Warnock hereby incorporates by reference section III at page 26-31 of Anderson's opening brief.

## B. The Charged Scheme

The government charged Warnock in a scheme to bribe Grant, Gilkey and Anderson "a stream of benefits, cash, checks, lavish trips, tickets to events, private plane rides, and more, in exchange for their votes and official actions" in order to control CMU and get lucrative contracts. ROA.824-25, 1560. The government alleged that Warnock was provided engineering contracts with CMU and essentially control of the board in exchange for those benefits. *Id*. Fatal to the government's theory is that the majority of benefits identified were provided after Warnock had secured an engineering contract with CMU and there was no agreement that Warnock would provide these benefits in exchange for the contracts at the time he received them. Additionally, the government's evidence that Warnock allegedly controlled the board consists of nothing more than Warnock's attempts to fulfill his obligations under the engineering services agreements and his insistence that CMU do the same.

## SUMMARY OF ARGUMENT

This case presents exactly the type of "unfair trap" that the Supreme Court warned about in *Snyder v. United States*, 603 U.S. 327 (2024). Warnock was a wealthy businessman who provided high-quality engineering services for private companies and local government agencies across Mississippi for almost 20 years. In that capacity, he made connections with people across all sectors of society, including local public officials like Grant, Gilkey and Anderson, many of whom he considered to be friends. Warnock's employment record speaks for itself in that he did not need to "bribe" anyone to get work. In fact, the quality of work he provided has never come into question. And Warnock did not bribe anyone to get the CMU work in this case. It is telling that the vast majority of the so-called "stream of benefits" that Warnock provided were given *after* he received the CMU contract. Even more telling, is that the benefits provided were the same as those he provided all his friends. The testimony was that Warnock did not treat them any differently than he treated his other customers.

By all accounts Warnock was simply very generous – a fact known to all in the case, and which nobody, including the co-conspirators, viewed to be illegal or nefarious at the time they were on the receiving end of his generosity. Warnock never asked for or expected anything in exchange for the money and gifts he doled out, and certainly had no intention that they would be part of a "quid pro quo" for any official action or in exchange for government contracts that he had already been awarded.

Warnock was simply treating his friends and colleagues to a nice time and, at most, providing gratuities as a token of appreciation for the business he already received. *Snyder,* 603 U.S. at 331 ("Gratuities are typically payments made to an official after an official act as a token of appreciation."). This conduct is not illegal.

In rejecting the government's argument that bribery under § 666 also criminalizes "wrongful" gratuities, the Supreme Court in Snyder explained:

> That is no guidance at all. Is a $100 Dunkin' Donuts gift card for a trash collector wrongful? What about a $200 Nike gift card for a county commissioner who voted to fund new school athletic facilities? Could students take their college professor out to Chipotle for an end-of-term celebration? And if so, would it somehow become criminal to take the professor for a steak dinner? Or to treat her to a Hoosiers game?

*Snyder*, 603 U.S. at 343–44 . The facts in this case are simply an extension of these scenarios posed by the Supreme Court and ultimately determined not to be unlawful. *Id*. The Court was clear that there is no bribery "if the official has taken the official act before any reward is agreed to, much less given." *Id*. Here, the supposed rewards were given after the official acts – there is no evidence that there was ever any agreement or expectation that official acts be taken in exchange for any benefits. Accordingly, Warnock's convictions must be overturned.

At the very least, Warnock is entitled to a new trial due to errors in the jury instructions that allow for a conviction based on gratuities alone in violation of *Snyder*. Additionally, Warnock's convictions relied upon admission of Jerome Miles's

prerecorded hospital deposition in violation of Federal Rule of Criminal Procedure 15 and the Confrontation Clause.

Finally, even if the Court finds that Warnock's convictions must be sustained and a new trial is not warranted, Warnock is entitled to resentencing due to the errors in calculating Warnock's sentence under the sentencing guidelines, resulting in a substantially inflated sentence.

## ARGUMENT

### I. The District Court Erred in Denying Appellant's Rule 29 Motion for Acquittal Based on Insufficient Evidence.

#### A. Legal Standard

Federal Rule of Criminal Procedure 29 provides that "[a]fter the government closes its evidence…, the [trial] court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Fifth Circuit reviews a district court's denial of a motion for judgment of acquittal *de novo*. *United States v. Garcia-Gonzalez*, 714 F.3d 306, 313 (5th Cir. 2013). In doing so, the Court "must assess whether a reasonable jury could have properly concluded, weighing the evidence in a light most deferential to the verdict rendered by the jury, that all of the elements of the crime charged had been proven beyond a reasonable doubt." *United States v. Hope*, 487 F.3d 224 (5th Cir. 2007) (quoting *U.S. v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005)). The Court may not sustain a verdict that "rest[s] on mere suspicion, speculation, or conjecture, or on an

overly attenuated piling of inference on inference." *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) (quoting *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996)). Likewise, "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed." *U.S. v. Tomblin*, 46 F.3d 1369, 1381 (5th Cir. 1995).

### B. Warnock's Convictions Should Be Reversed Because There Was Insufficient Evidence of an Unlawful Agreement or *Quid Pro Quo*.

Even viewed in the light most favorable to the verdict, the government's evidence fails to establish the essential element of a quid pro quo agreement. At most, the record shows a longstanding personal and professional relationship marked by generosity and post hoc benefits—conduct that, under Snyder, does not constitute bribery absent an agreement to exchange things of value for official action. No rational juror could conclude beyond a reasonable doubt that such an agreement existed.

Warnock was convicted on four separate counts predicated on the alleged bribery scheme: (1) conspiracy to commit bribery under 18 U.S.C. § 666 in violation of 18 U.S.C. § 371 (Count 1), (2) conspiracy to commit bribery under 18 U.S.C. § 1952 in violation of 18 U.S.C. § 371 (Count 2), (3) conspiracy to commit honest-services wire fraud under 18 U.S.C. §§ 1343 and 1346 in violation of 18 U.S.C. § 1349 (Count 3) and (4) honest services wire fraud in violation of §§ 1343 and 1346. ROA.499-523, 571-72.

To support a conspiracy conviction under § 371, as in Counts 1 and 2, "the government must prove three elements: (1) an agreement between two or more people to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the conspirators in furtherance of the conspiracy's objective." *United States v. Porter*, 542 F.3d 1088, 1092 (5th Cir. 2008). Likewise, to support a conspiracy conviction under § 1349, as in Count 3, the government must show "(1) two or more persons made an agreement to commit an unlawful act; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, with the intent to further the unlawful purpose." *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014). "The degree of criminal intent necessary to sustain a conviction of conspiracy is the same as to sustain a conviction of the underlying offense." *United States v. Shah*, 84 F.4th 190 (5th Cir. 2023).

Because "[t]he crime of conspiracy condemns the agreement itself…, [w]ithout an agreement, there is no conspiracy." *United States v. Ganji*, 880 F.3d 760, 777 (5th Cir. 2018) (internal citations omitted). Thus, to support a conspiracy conviction under either § 371 or § 1349, the government must prove the existence of an agreement to commit the underlying illegal act beyond a reasonable doubt. *Id*. While the agreement need not be express or explicit, "[p]roof of an agreement to enter into a conspiracy is

not to be lightly inferred." *Id.* (quoting *United States v. Johnson*, 439 F.2d 885, 888 (5th Cir.)).

"Mere similarity of conduct among various persons and the fact that they have associated with or are related to each other" is insufficient to prove an agreement. *Id.* (quoting *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978)). Rather, concerted action will only prove an agreement when the actions and the surrounding circumstances "illustrate a 'conscious commitment to a common scheme designed to achieve an unlawful objective'" and are "incriminating enough to warrant a finding that the Government proved the existence of an agreement beyond a reasonable doubt." *Ganji*, 880 F.3d at 777. Thus, to support Warnock's conspiracy convictions, the government must prove the existence of an agreement to commit bribery beyond a reasonable doubt. *Id.*

Each of the government's charges is predicated on the offense of bribery requiring a quid pro quo agreement, or in other words, evidence that Warnock provided something of value to the alleged co-conspirators, as public officials, with the intent to influence an official act – in other words, quid pro quo. *United States v. Hamilton*, 46 F.4th 389, 399 (5th Cir. 2022) (bribery under § 666 requires quid pro quo); *Snyder v. United States*, 603 U.S. 327, 337–38 (2024) (holding that § 666 is limited to bribery requiring a *quid pro quo*); *Skilling v. United States*, 561 U.S. 40 (2010) (holding that honest services fraud under § 1346 is limited to bribery with elements similar to §

201); *see also United States v. Nagin*, 810 F.3d 348, 351 (5th Cir. 2016) (holding that honest services fraud under §1346 requires *quid pro quo*). Mere gratuities are insufficient. As the Court in *Snyder* explained:

> In sum, § 666 tracks § 201(b), the bribery provision for federal officials. A state or local official can violate § 666 when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act. But a state or local official does not violate § 666 if the official has taken the official act before any reward is agreed to, much less given. Although a gratuity offered and accepted after the official act may be unethical or illegal under other federal, state, or local laws, the gratuity does not violate § 666.

*Snyder*, 603 U.S. 327, 347.

There is no evidence in the record proving that any agreement to commit bribery existed or that Warnock entered into any such agreement with the specific intent that bribery be committed. *See e.g. Ocasio v. United States*, 578 U.S. 282, 288 (2016) (conspiracy requires that a defendant "reach an agreement with the 'specific intent that the underlying crime be committed' by some member of the conspiracy").

Specifically, the government failed to provide any evidence of an express agreement to commit bribery between Warnock and any of the alleged co-conspirators. To the contrary, the government's own witnesses provided substantial testimony that specifically denied the existence of such an agreement, particularly by Warnock. Indeed, Grant specifically testified that on February 27, 2018, he signed a statement swearing that Warnock never offered him money, services or anything of value in

exchange for any contracts with the City of Canton or ever attempted to bribe him. ROA.1025:2-9. When asked by Appellant's counsel whether that was a true statement, Grant replied, "Yes." *Id.*

Additionally, the defendants concerted actions did not prove an agreement to commit bribery beyond a reasonable doubt. *See Ganji*, 880 F.3d at 777. To the contrary, the government witnesses testified that Warnock provided benefits after he received the contract with CMU, was known to be generous and simply treated Grant, Gilkey and Anderson as he would any other client. These circumstances cannot prove beyond a reasonable doubt that Warnock acted with sufficient intent to sustain his convictions. *Id.*

## II. Errors in the Trial Court's Jury Instructions Require Reversal of Warnock's Convictions.

### A. Legal Standard

Jury-instruction challenges that "hinge[] on a question of statutory construction" are reviewed de novo, while the propriety of jury instructions are reviewed for an abuse of discretion. *United States v. Hamilton*, 46 F.4th 389, 394 (5th Cir. 2022). "An instruction is not an abuse of discretion if, all things considered, the instruction 'is a correct statement of the law' and it 'clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" *Id.* A failure to instruct a jury on every essential element is error. *United States v. Stanford*, 823 F.3d 814, 828 (5th Cir.

2016). Likewise, "it is an abuse of discretion 'to apply an erroneous view of the law.'" *Hamilton*, 46 F.4th at 394.

### B. Instructions Only Included Intent Required for Receiver of Bribe Not Payor.

As an initial matter, the Court failed to properly instruct the jury on the intent element of "bribery of a public official" necessary to convict Warnock of Counts 1, 2 and 3. ROA.508-23. The jury instructions state that the third element required for the underlying offense of bribery "as to Defendant Warnock" is "[t]hat Defendant Warnock corruptly gave, offered, or agreed to give cash or luxury gifts to Defendant Anderson, Andrew Grant, or Eric Gilkey with the intent to influence or reward Defendant Anderson, Andrew Grant, or Eric Gilkey in connection with any business, transaction, or series of transactions of the City of Canton, Mississippi, or any agency thereof." ROA.512. However, the instructions never define what is meant by "intent to influence or reward." Instead, the instructions only define "intent *to be* influenced or rewarded," which is not applicable to Warnock. ROA.514 (emphasis added).

More specifically, the jury instructions state that:

> "The term 'intent to be influenced or rewarded' means that the defendant must have had a specific intent to act or refrain from acting on a person's behalf in exchange for a thing of value received from a person. This statute does not criminalize soliciting, demanding, accepting, or agreeing to accept mere gratuities or gifts with no intent to act or refrain from acting on a person's behalf in exchange for the thing of value."

ROA.514. The intent described in the jury instructions clearly does not apply to Warnock.

### C. The Jury Instructions Permitted Conviction for Conduct that *Snyder* Holds is not Criminal Under 18 U.S.C. § 666.

Section 666(a)(1)(B) makes it unlawful for public officials corruptly to solicit or accept things of value "intending to be influenced or rewarded" in connection with government business. 18 U.S.C. § 666(a)(1)(B). As the Supreme Court made clear, § 666 does not criminalize post hoc rewards for completed official acts; it reaches only agreements to exchange things of value for future official action. *Snyder*, 603 U.S. at 347.

Here, the jury instructions permitted a conviction based on an intent to "reward," without requiring any finding of an agreement to exchange things of value for future official action. In doing so, the instructions allowed the jury to convict Warnock for conduct that *Snyder* makes clear is not criminal. That was legal error. *See id.; Hamilton,* 46 F.4th at 394.

## III. Admission of Jerome Miles's hospital deposition was an abuse of discretion under Rule 15 and violated Appellant's rights under the Confrontation Clause.

### A. Standard of Review

A district court's decision to permit the taking and use of a deposition under Federal Rule of Criminal Procedure 15 is reviewed for abuse of discretion. *United States v. Dillman*, 15 F.3d 384, 389 (5th Cir. 1994); *United States v. Dearden*, 546 F.2d

622, 624 (5th Cir. 1977). Whether the admission of such testimony violates the Confrontation Clause presents a question of law reviewed de novo. *United States v. Acosta*, 475 F.3d 677, 680 (5th Cir. 2007). If a Confrontation Clause violation is established, the government bears the burden of demonstrating that the error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *see also United States v. Jimenez*, 464 F.3d 555, 562 (5th Cir. 2006).

**B. Argument**

Federal Rule of Criminal Procedure 15 permits the use of deposition testimony in criminal cases only in limited and exceptional circumstances. *See* Fed. R. Crim. P. 15(a). The Fifth Circuit has recognized that Rule 15 is an extraordinary procedure, not a routine substitute for live testimony. *See United States v. Dearden,* 546 F.2d 622, 624 (5th Cir. 1977); *United States v. Lucas*, 516 F.3d 316, 348 (5th Cir. 2008) ("The words 'exceptional circumstances' bespeak that only in extraordinary cases will depositions be compelled.") (quotation and citation omitted). A party seeking to depose a witness under Rule 15 bears the burden of demonstrating both "exceptional circumstances" and that the use of deposition testimony is in the "interest of justice." *Id.* That party must also give reasonable written notice of the deposition's date and location to every other party and the officers who have custody of the defendants. Fed. R. Crim. P. 15(a)-(b),

The record reflects that the government sought to present Jerome Miles's testimony through a prerecorded hospital deposition over defense objection, and the district court permitted its use based on representations regarding Miles's medical condition. ROA.1381-83; ROA.1483–88.

That showing was insufficient. The district court relied on representations that Miles had been hospitalized following an episode of blood loss and was undergoing evaluation, including dialysis and a scheduled colonoscopy. ROA.1483-86. The defense challenged that showing, arguing that "there's been no medical evidence presented" to support the claim that Miles could not testify and noting that the procedure was not life-threatening and could be scheduled at another time. ROA.1483-84.

The record contains no medical documentation or testimony establishing that Miles was unable to appear in court. Instead, the district court relied on unsworn representations from counsel. That absence significantly undermines the government's showing. A finding of unavailability requires evidence that the witness cannot testify due to a then-existing physical condition, not merely that doing so would be inconvenient. Rule 15 does not permit substitution of deposition testimony based on convenience or scheduling difficulty; it requires a showing that live testimony cannot reasonably be obtained. See *Dearden*, 546 F.2d at 624.

Despite this limited record, the district court concluded, without detailed findings, that Miles's hospitalization constituted an "exceptional circumstance" and that the use of his deposition was warranted. ROA.1485-87. The court did not address whether a continuance would have allowed live testimony, whether the procedures could be rescheduled, or whether alternative measures could preserve the defendant's right to confrontation. Nor did it require the government to demonstrate that the use of deposition testimony was necessary rather than expedient. See *Dearden,* 546 F.2d at 624. As the court stated, "The Court finds that that is an exceptional circumstance and the interests of justice were served by deposing him to preserve his testimony and allow it to be presented to the jury". ROA.1487. That conclusion, however, rests solely on the fact of hospitalization and not on a developed evidentiary showing that the witness could not testify at trial.

The importance of the testimony underscores the deficiency of that analysis. The government identified Miles as a witness who would testify regarding a $9,200 check allegedly issued by Mr. Warnock, including the handling and distribution of those funds. ROA.1384-87. That testimony bore directly on a disputed component of the government's theory. Where testimony is central, Rule 15 demands a correspondingly careful and supported showing of necessity. That showing was not made here.

On this record, the district court permitted the substitution of prerecorded testimony for live testimony without the evidentiary support and particularized findings required by Rule 15. The ruling constitutes an abuse of discretion.

Even if the district court's ruling could be sustained under Rule 15, the admission of Miles's deposition testimony independently violated the Confrontation Clause because the government failed to establish true unavailability. The Confrontation Clause prohibits the admission of testimonial statements unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington,* 541 U.S. 36, 59 (2004). There is no dispute that Miles's deposition testimony was testimonial or that defense counsel cross-examined him. Those facts satisfy only one component of the constitutional requirement.

The government was also required to demonstrate that Miles was genuinely unavailable to testify at trial. A witness is not considered unavailable unless the government has made a good-faith effort to secure the witness's presence. *Barber v. Page*, 390 U.S. 719, 724–25 (1968).

The record does not reflect such an effort. The government relied on generalized statements regarding Miles's medical condition and presented no competent evidence demonstrating that he could not testify in court. ROA.1484-85. The defense challenged that showing, emphasizing that the procedure was not life-threatening and could be rescheduled. *Id*.

The district court accepted those representations without requiring a developed evidentiary basis. That showing is insufficient. The constitutional requirement of unavailability demands proof of inability to secure live testimony, not assertions of inconvenience.

Nor do cases permitting the use of prior testimony alter this conclusion, as those decisions presuppose a legitimate showing of unavailability. See *Mancusi v. Stubbs*, 408 U.S. 204, 213–16 (1972); *California v. Green*, 399 U.S. 149, 165–66 (1970). Where that predicate is absent, prior testimony cannot substitute for live confrontation.

Because the government failed to establish that Miles was truly unavailable, the admission of his deposition testimony violated the Confrontation Clause.

The error was not harmless beyond a reasonable doubt. In assessing harmlessness in the Confrontation Clause context, courts consider the importance of the witness's testimony, whether it was cumulative, whether it was corroborated, the extent of cross-examination permitted, and the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

The government's closing argument confirms the central role of Miles's testimony across multiple aspects of its case. First, the government relied on the $9,200 check issued to Miles as a key piece of evidence, arguing that it was "falsely represented as a salary" and formed part of the alleged scheme. ROA.1582-83. Second, the government framed Miles as the mechanism through which the scheme operated,

asserting that Mr. Warnock "used Jerome Miles as a conduit for kickbacks" and that the check to Miles was used to distribute payments to others. ROA.1578-80. Third, the government used this structure to establish knowledge and intent, arguing that the use of an intermediary and the characterization of the payment as salary reflected deliberate concealment and a willful effort to carry out the alleged scheme. ROA.1580-83. Finally, the government relied on Miles to corroborate other witnesses, emphasizing that his testimony, together with the check, reinforced the testimony of cooperating witnesses such as Gilkey. ROA.1583-85. This use of Miles's testimony across multiple dimensions of the government's theory demonstrates that he was a significant witness whose testimony was neither cumulative nor peripheral.

First, Miles's testimony was important to the government's case. The government identified him as a witness who would testify regarding a $9,200 check allegedly issued by Mr. Warnock and the distribution of those funds. ROA.1384-87. That testimony provided a direct link between the documentary evidence and the government's theory of the transaction. Without it, the government's narrative lacked the same explanatory force.

Second, the testimony was not cumulative. While documentary evidence was introduced, those materials did not explain the alleged purpose or distribution of the funds. Miles's testimony supplied that narrative and connected the documentary evidence to the government's theory.

Third, the testimony served to corroborate other witnesses whose credibility was subject to challenge. The defense raised issues concerning prior inconsistent statements and credibility concerns. In that context, Miles's testimony reinforced the government's version of events and may have influenced the jury's assessment of those witnesses.

Fourth, although cross-examination occurred, it did not substitute for live testimony before the jury. The deposition took place in a hospital setting, not in open court, and the jury did not observe Miles testify live. ROA.1485-88. That limitation is particularly significant in a case involving disputed interpretations of financial transactions and credibility assessments. The deposition was presented to the jury through a prerecorded video rather than live testimony in the courtroom. The court instructed the jury to treat the testimony as if given in court, but the manner of presentation necessarily differed from live testimony, including the absence of real-time interaction, objection, and courtroom dynamics. ROA.1500.

Finally, the government's case cannot be characterized as overwhelming in the absence of this testimony. The government relied on Miles to support a specific component of its theory concerning the $9,200 transaction. This is not a case in which the challenged testimony was peripheral or duplicative. See *United States v. Jimenez*, 464 F.3d 555, 562–63 (5th Cir. 2006).

The admission of Miles's deposition testimony was not a minor evidentiary ruling. It altered the manner in which a central portion of the government's case was presented and deprived the jury of the opportunity to evaluate a key witness through live testimony. Under these circumstances, the error cannot be deemed harmless beyond a reasonable doubt.

## IV. The District Court Erred in Calculating the Guidelines Range Under U.S.S.G. § 2C1.1(b)(2) and Committed Procedural Error.

### A. Standard of Review

This Court reviews the district court's interpretation and application of the Sentencing Guidelines de novo and its factual findings, including loss findings, for clear error. *United States v. Harris*, 821 F.3d 589, 601 (5th Cir. 2016). The issue was preserved both in the written objections to the PSR and again at sentencing. In the addendum, probation summarized Warnock's material objection as follows: he objected to the 18-level increase because "(a) there was no loss, (b) the defendant is entitled to deduct his loss of actual services provided from any loss; and (c) the proposed specific offense characteristic overstates the seriousness of the offense." Addendum to PSR, Dkt. 240-1, at 1. Defense counsel repeated that objection orally at sentencing. ROA.1660-68.

### B. Argument

The district court's error was both substantive and procedural: it misapplied § 2C1.1(b)(2) by relying on gross invoice amounts rather than net value, and it

compounded that error by adopting a flawed methodology that effectively shifted the burden to the defense. U.S.S.G. §2C1.1(b)(2) does not permit a court to equate the gross amount of contracts or invoices with the proper enhancement figure whenever bribery is involved. The Guideline instead directs the court to use the greatest of four measures: the value of the payment, the benefit received or to be received, the value of anything obtained by a public official or others acting with a public official, or the loss to the government. *Id.* U.S.S.G. §2C1.1(b)(2)'s commentary, specifically Application Note 3, clarifies that the "benefit received or to be received" refers to the net value of that benefit.

The Fifth Circuit has repeatedly enforced that principle. In *United States v. Teel*, 691 F.3d 578, 588-89 (5th Cir. 2012), the Court explained that the value of the benefit received or to be received means the "net value" of the benefit. This ruling emphasizes calculating actual profit rather than gross amounts in bribery schemes. In *United States v. Harris*, 821 F.3d 589, 603-04 (5th Cir. 2016), the Court held that, in contract-procurement cases, the loss amount should reflect the contract price less the fair market value of services rendered. Furthermore, in *United States v. Sublett*, 124 F.3d 693, 694-95 (5th Cir. 1997), the Court held that where services were actually rendered, the district court could not simply use the gross contract amount without crediting value provided.

That is the defect here. The written PSR objections did not merely deny the enhancement in conclusory terms. They specifically argued that § 2C1.1(b)(2) required deduction of "all variable costs that can be identified as costs of performing a contract," cited authority for the proposition that the benefit received is the net value less direct costs, and argued that every invoice submitted to the City and CMU reflected actual work performed, actual materials supplied, and actual services rendered, with no fake, sham, or padded invoices. Def.'s PSR Objs., Dkt. 240-2, at 8-11. Defense counsel likewise argued at sentencing that the public entities "got value for the services," that the services "were not sham," and that Warnock was entitled to a deduction or credit for legitimate engineering services and business costs. ROA.1662-64.

The probation materials sharpen the issue rather than solve it. The addendum identified as a required sentencing finding whether "the loss amount was properly calculated in this case pursuant to USSG §§ 2C1.1(b)(2) and 2B1.1(b)(1)." Addendum to PSR, Dkt. 240-1, at 2. Probation then took the position that the PSR had identified "the contracts awarded during the conspiracy, the invoices submitted, and the trips and cash bribes awarded to codefendants," and that a "reasonable estimate of the intended loss" was not limited to the amount the defendant was capable of inflicting. *Id.* at 2-4. Probation further asserted that the contracts awarded to Warnock as a result of the bribes were worth \$43.1 million, that this produced a net-value benefit of over \$1.1 million, and that the intended net-value benefit exceeded \$6.6 million. *Id.* at 3.

But the district court did not actually sentence on that articulated "net value" theory. At sentencing, after correctly acknowledging *Teel* and *Harris*, the court held that "the government has met its burden by establishing the pecuniary loss using the face value of the invoices," and that calculating loss "by any other means would be the kind of speculation that *Nelson* forbids." ROA.1670. That oral ruling matters, because it reveals the methodology the court actually used: not a true net-value calculation, but a face-value-of-invoices shortcut.

The sealed PSR confirms why that shortcut was consequential. The PSR listed the invoices billed to CMU and paid between July and December 2016 and stated that Warnock & Associates "billed and received approximately $1,132,310.31" during that period. Sealed PSR, Dkt. 240 at 49-50. The PSR then listed additional invoices not paid by CMU and stated that Warnock & Associates "billed CMU approximately $6,675,374.87" between December 28, 2016, and January 24, 2017. Sealed PSR, Dkt. 240 at 50-51. Those numbers are the backbone of the loss/benefit dispute. But numbers alone do not answer the legal question under § 2C1.1(b)(2). They show gross billing and claimed unpaid billing; they do not themselves establish net benefit or net loss after credit for services rendered.

Additionally, the same PSR contains facts pointing in both directions. The court relied at sentencing on PSR paragraphs 46, 49, 61, 63, 64, and 139 as evidence of discrepancies, inflated invoices, and work that allegedly would not have been done

absent bribery. ROA.1671. Some of those paragraphs indeed contain allegations that invoices were vague or possibly duplicative, that one CHS believed a sewer-map invoice was bogus, and that Noble believed there was no true sewer emergency. Sealed PSR, Dkt. 240 at 11-15. But those same materials do not eliminate the need for a lawful net-value analysis; they only show factual disputes about the extent and value of the work. The answer to disputed valuation is not to default automatically to gross invoice totals.

That is especially so because the district court itself later recognized that this was not a no-performance case. In explaining the sentence, the court distinguished bribery cases where contracts are paid and "the work is never performed," then expressly found that here "at least some of the services and many of the services were actually performed" and that "some of the services had value," even though no evidence had quantified a fair-market-value offset. ROA.1689-90. The Statement of Reasons says the same thing in written form: the court selected a below-guidelines sentence in part because the Chapter Two offense level overstated the seriousness of the offense; it stated that the "loss amount attributable to the defendant was appropriate, but the Court acknowledged the lack of offset available," and further explained that a downward variance was appropriate because "legitimate services … were rendered but were indeterminable as no evidence was provided regarding the fair market value." Statement of Reasons, Dkt. 244, at 3.

That written explanation helps Warnock more than the government. It confirms that the court understood real services had been performed, yet still left the Guidelines calculation anchored to gross billing figures because no quantified offset was presented. But *Harris* and *Sublett* do not permit a court to use gross invoice or contract amounts as the default operative figure simply because valuation proof was incomplete. In a contract-performance case, the governing legal question is net value, not face value.

The government's position below was that any contracts obtained through bribery were void, that Warnock never should have gotten them, and that intended loss was also reflected by the later civil-demand invoices. ROA.1665-66. The sealed PSR mirrors that position by listing $6.675 million in unpaid invoices and then separately listing later amended 2017 invoices that probation believed were part of the civil lawsuit but "were not included within the loss amount." Sealed PSR, Dkt. 240 at 50-51. That only underscores the problem: the record contains several possible numbers and several possible measures, but the sentencing court resolved the dispute by relying on "the face value of the invoices." ROA.1670.

The burden-shifting point also does not resolve the error. The district court noted that Warnock failed to prove the market value for the engineering services provided. ROA.1670-71. However, even if the defendant has the burden of proving credits or offsets once the government presents a proper initial case, the government's initial

proof must still be based on the correct legal framework. Here, the written objections expressly raised direct costs, actual services, and the absence of sham invoices. Def.'s PSR Objs., Dkt. 240-2, at 8-11; Addendum to PSR, Dkt. 240-1, at 1-4. Once the court also recognized that many services were performed and had value, it could not simply collapse the inquiry into gross invoice totals.

The error was material. The court overruled the objection to the 18-level enhancement, adopted the PSR in full, and calculated a total offense level of 36 and an advisory range of 188 to 235 months. ROA.1671-74. The Statement of Reasons confirms those same Guidelines findings. Statement of Reasons, Dkt. 244, at 2. Although the court later varied downward to 144 months, it described the variance as slight and tied it in part to the fact that some services had real value. ROA.1689-90. That reflects a problem with the Guidelines calculation, not a solution.

To be sure, the district court also stated that it would have imposed the same sentence regardless of any Guidelines error. ROA.1693. But where the court's own stated reason for varying downward is that legitimate services were rendered and the loss calculation lacked a proven offset, the harmlessness question becomes especially difficult. At minimum, remand is warranted so the district court can resentence under the correct § 2C1.1(b)(2) methodology rather than a face-value-of-invoices approach.

For those reasons, the sentence should be vacated and the case remanded for resentencing.

## CONCLUSION

Appellant prays that this Court vacate his sentence and remand for resentencing, or for such relief as he may justly be entitled to.

**RESPECTFULLY SUBMITTED,** this 17th day of June, 2026.

Rudolph Warnock, Appellant

By: /s/ Keith B. French
KEITH B. FRENCH LAW, PLLC
401 E. Capitol St., Suite 515
Jackson, MS 39201
(832) 243-6153
(832) 243-1927 – Facsimile

**CERTIFICATE OF SERVICE**

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing BRIEF OF APPELLANT was served, via the Court's CM/ECF system, upon the following registered CM/ECF users:

Jennifer Case
Assistant U. S. Attorney
Email: Jennifer.L.Case@usdoj.gov

**Attorney for Appellee**

I also certify that: 1) all privacy redactions have been made pursuant to 5th Cir. Rule 25.2.13; 2) the electronic submission is an exact copy of the paper documents pursuant to the 5th Cir. Rule 25.2.1; and 3) the document has been scanned for viruses with the most recent version of Norton Anti-Virus and is free of viruses. Further, I certify that I sent a paper copy via regular mail to Mr. Jimenez.

*/s/ Keith B. French*

Keith B. French

# CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5th Cir. R. 32.2.7(b).

1. Exclusive of the exempted portion in 5th Cir. R. 32.2.7(b)(3), this brief contains fewer than 13,000 words.

2. This brief has been prepared in proportionally spaced typeface using Word in Times New Roman typeface and 14-point font size.

3. The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

THIS, the 17th day of June, 2026.

*/s/Keith B. French*
Keith B. French